831 So.2d 296 (2002)
PETER VICARI GENERAL CONTRACTOR, INC.
v.
Kirk D. ST. PIERRE, St. Pierre Ready Mix, Inc., James F. Willeford, as Liquidator of/and Gator Ready Mix, Inc., and Scottsdale Insurance Company.
No. 02-CA-250.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 2002.
*297 William E. O'Neil, Alanson T. Chenault, Tracy J. Hayes, The O'Neil Group, L.L.C., *298 New Orleans, LA, for Appellants Gator Ready Mix, Inc. and Scottsdale Insurance Company.
William W. Hall, Metairie, LA, for Appellee Pete Vicari General Contractor, Inc.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS F. DALEY.
JAMES L. CANNELLA, Judge.
In a contract dispute, the Defendants, Gator Ready Mix, Inc. (Gator) and Scottsdale Insurance Company (Scottsdale), appeal from a judgment in favor of the Plaintiff, Pete Vicari General Contractor, Inc. We affirm.
In February of 1994, the Plaintiff, a general contractor owned by Pete Vicari (Vicari), began rebuilding Grand Isle High School in Grand Isle, Louisiana, which had been demolished by a tornado. The new school was to be raised above the ground on concrete slabs supported by steel enforced concrete columns. The concrete for the job was mixed, or batched, at the supplier's plant, brought to the site in a cement mixer truck and poured at the site into the molds for the columns and slabs. During the construction, problems arose with the strength of some of the concrete columns, which resulted in the demolition and re-pouring of fifteen columns.
On May 4, 1995, the Plaintiff filed suit against James F. Willeford, as liquidator of/and Gator, St. Pierre Ready Mix, Inc. (St.Pierre), and Kirk St. Pierre for the costs of demolishing and re-pouring the columns. Before suit was filed, two arbitration proceedings were brought by St. Pierre for unpaid balances. The Plaintiff filed a reconventional demand for the damages resulting from the defective concrete. After separate arbitration hearings on two different claims, St. Pierre received two awards. The Plaintiff thereafter filed motions to vacate the awards, claiming that its demand had not been considered or addressed and that the awards were incomplete under the arbitration procedures. However, the motions were denied and confirmed in a judgment by the Twenty-Fourth Judicial District Court for the Parish of Jefferson. Subsequently, the Plaintiff paid the judgments. The present action was then filed. Among the allegations in this lawsuit, the petition claims that Gator and its insurer, Scottsdale, are liable based on the breach of an oral contract to supply the concrete for the Grand Isle job. A joint motion later dismissed St. Pierre and Kirk St. Pierre. Gator and Scottsdale filed exceptions of res judicata, prescription, no cause of action, and lack of subject matter jurisdiction. The exceptions were denied and the matter was tried on July 9, 2001. On September 11, 2001, the trial judge rendered a judgment in favor of the Plaintiff for $116,295.23.
On appeal, the Defendants assert that the trial judge erred in denying the exceptions of res judicata, prescription, and lack of subject matter jurisdiction, and in denying their motion for directed verdict (involuntary dismissal). They further contend that the trial judge erred in finding that the Plaintiff proved the existence of an oral contract by a preponderance of the evidence.

RES JUDICATA AND LACK OF SUBJECT MATTER JURISDICTION
The Defendants contend that the issue of the Plaintiff's damages is res judicata because it was considered and rejected in the arbitration proceedings.
La.R.S. 13:4231 states in part:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:

*299 (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
Res judicata promotes judicial efficiency and final resolution of disputes. Terrebonne Fuel Lube v. Placid Refining, 95-0654, 95-0671, pp. 11-12 (La.1/16/96), 666 So.2d 624, 631. A judgment determining the merits of a case is a final judgment. La. C.C.P. art. 1841. See also, Tolis v. Board of Sup'rs of Louisiana State University, 95-1529 (La.10/16/95), 660 So.2d 1206. A valid and final judgment is conclusive between the same parties, except on appeal or other direct review. La.R.S. 13:4231. A final judgment from which there can be no appeal acquires the authority of the thing adjudged. Once a final judgment acquires the authority of the thing adjudged, no court has jurisdiction to change the judgment. Tolis at p. 3, 660 So.2d at 1206-1207. Identity of parties does not mean the parties must be the same physical or material parties, but they must appear in the suit in the same quality or capacity. Morris v. Haas, 95-75 (La.App. 5th Cir.5/30/95), 659 So.2d 804, 810, writs den. 95-2519, 95-2545 (La.12/15/95), 664 So.2d 441.
Subject matter jurisdiction is the "the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted." La. C.C.P. art. 2. Subject matter jurisdiction is created by the constitution or legislative enactment; see, e.g., La. Const. Art. 5, and it cannot be waived or conferred by the consent of the parties, see La. C.C.P. arts. 3 & 925.
Once arbitration has commenced, the courts are precluded from exercising jurisdiction. Woodson Construction Co., Inc. v. R.L. Abshire Construction Co., Inc., 459 So.2d 566, 570-571 (La.App. 3rd Cir. 1984). Furthermore, the award of an arbitrator is res judicata, and must be affirmed unless grounds are established in accordance with arbitration law for the vacation, modification, or correction of the award. Id.
The evidence shows that, in December of 1993, the Plaintiff submitted its bid to reconstruct the Grand Isle High School to the Jefferson Parish School Board (JPSB). In conjunction with the bid, the Plaintiff needed a concrete supplier within thirty minutes from the site because the concrete had to be poured within one and one-half hours after mixing. Gator, the only supplier within the necessary distance, was located nearby in Fouchon, Louisiana. Vicari contacted Gator and spoke to both Theresa and Eddie St. Pierre, the owners. They quoted a price of $78.50 per yard, which was higher than normal because of the distance the gravel truck had to travel to the Gator mixing plant. Pea gravel is one of the components of concrete, along with water, sand, and cement.
On January 20, 1994, the JPSB awarded the construction contract to the Plaintiff. He telephoned Theresa and Eddie St. Pierre to discuss the concrete contract. According to Vicari, they agreed orally to supply the concrete, which they would mix or "batch" at their plant. However, because they had no trucks that could perform the deliveries, the concrete would be delivered by St. Pierre, and Plaintiff was told to issue the purchase order in that name, which it did. The purchase order included an arbitration clause, and set out the price and the pounds per square inch (PSI), or strength rating, for the concrete to be supplied. Kirk St. Pierre signed the *300 purchase order on February 10, 1994 and the Plaintiff signed on February 28, 1994. According to Vicari's testimony, he did not know that Theresa St. Pierre and one of her sons, Eddie St. Pierre, owned Gator and that Kirk St. Pierre, Theresa St. Pierre's other son, and his wife owned St. Pierre. Believing both companies to be owned by the same people, he did not reduce the oral agreement with Gator to writing. Work on the project started in late February of 1994. Unknown to the Plaintiff, Gator had begun liquidation proceedings sometime after December of 1993. In March 15, 1994, St. Pierre and Gator, through its liquidator, executed a rental agreement in which St. Pierre rented the Gator plant and equipment. Although the contract was signed in March of 1994, it was made effective retroactive to February of 1994.
In early May of 1994, the architect, Anthony Gendusa (Gendusa), became concerned about some of the concrete columns. Eventually, fifteen had to be replaced because they did not meet the minimum PSI. The Plaintiff discovered the existence of the St. Pierre/Gator rental agreement in May or June of 1994, when it made a claim for damages on Scottsdale. In the meantime, the Plaintiff made a demand on St. Pierre to fix the problem. St. Pierre denied responsibility and the dispute escalated to the point that a new contract was negotiated in September of 1994 between the two parties. The repairs were made and the project eventually completed. The evidence further showed that although the Plaintiff communicated in writing with St. Pierre about the problems, it also communicated with Theresa and Eddie St. Pierre during that time about the under-strength concrete.
Following the trial, the trial judge concluded that Gator and St. Pierre were not the same for purposes of res judicata. He found that Gator was not a surety, because there was no evidence of any written surety agreement, and St. Pierre was simply a sub-contractor to Gator. Thus, there was no identity of parties as required for the preclusion effect of res judicata. We agree that the arbitration proceedings are not res judicata to this action and find that the trial judge did not err in denying that peremptory exception. Since Gator was not subject to arbitration or bound by the arbitration proceedings, the trial court has subject matter jurisdiction. Thus, we deny the declinatory exception of subject matter jurisdiction.[1]

PRESCRIPTION
When the concrete arrived at the site by truck, Alpha Testing and Inspections, Inc. (Alpha) conducted tests on each batch of concrete, monitored the temperature of the concrete, checked its consistency or "slump," and molded cylinders for the compression strength testing. Alpha had been hired by the JPSB for this purpose. According to the Frank Cerniglia (Cerniglia), Alpha's owner, the slump varies with the amount of water added to the mix. The specifications provided an acceptable range of 3" to 5." This number rises with the quantity of water added to the mix. It is usual for varying amounts of water to be added at the job site because often the batches are too thick to pour freely from the truck hose. The job superintendent, Charles Merwin (Merwin), testified that he ordered water to be added to the batches depending on the consistency of the mix when it arrived. Although *301 too much water can adversely affect the strength, other factors can cause problems with the PSI, including the amount of cement added to the mix at the plant, or a long delay between the time that the batch is mixed at the plant and the time that it is poured. The cement cannot remain in the truck more than 1½ hours or be churned for more than 300 revolutions. However, the cement was tested by Alpha at the site to insure that the concrete met the slump specifications and PSI at the time the concrete was poured. It was tested again at both seven and 28 days.
Alpha provided fifty-four reports to Gendusa and to Merwin. The reports showed that the first batches of concrete delivered to the Plaintiff met the strength requirements. However, batches numbered thirteen through twenty-three tested below the minimum PSI. After the report on batch number twenty-three showed an inadequate PSI, Cerniglia went to the Gator plant to observe the mixing process. After his visit, there were no further PSI problems with the concrete.
Gendusa reported the potential problems to the Plaintiff initially in a letter dated May 2, 1994. The Plaintiff sent a letter to St. Pierre, who disagreed that there was anything wrong with the mix. Further tests were ordered because the concrete may not have completed curing at that time. Concrete usually finishes curing in 28 days, but it can take longer. Thus, the witnesses testified that Gendusa's recommendation in the May 2, 1994 letter to re-pour certain columns was premature. As of May 12, 1994, there was still uncertainty about the matter. Alpha then performed core sample tests. The Plaintiff received those results on May 18, 1994. The report showed that fifteen columns required replacement, 9 of which were originally reported as defective. However, 6 new ones were found that did not meet the PSI.[2]
The trial judge concluded that the Plaintiff did not discover the defective concrete and consequent damages until May 18, 1994, based on the laboratory tests dated May 17, 1994. Thus, he found that the claim was not prescribed when it was filed on May 4, 1995. We find no error in this ruling.

ORAL CONTRACT
Under La.C.C. art. 1846, one witness and other corroborating circumstances must prove an oral contract for a price in excess of $500. Only general corroboration is required. Gulf Container Repair Services, Inc. v. FIC Business & Financial Centers, Inc., 98-1144 at p. 6 (La.App. 5th Cir.3/10/99), 735 So.2d 41, 43. It is not necessary that plaintiff offer independent proof of every detail. Id. The manifest error standard of review applies to a factual finding by the trier of fact in this regard and will not be overturned unless it is clearly wrong. Gulf Container Repair Services, Inc., 98-1144 at p. 6, 735 So.2d at 43.
Vicari testified that he orally contracted with Gator to supply the concrete and that Theresa St. Pierre told him to put St. Pierre's name on the purchase order, that St. Pierre had the trucks, but *302 the batches would be mixed at her plant. He also testified that he thought that the two companies were owned by the same parties and were interchangeable. This was the reason he wrote to St. Pierre about the problems. Furthermore, he continued to talk to Theresa and/or Eddie St. Pierre during the period when the dispute arose. He was never informed that they were not involved and he did not discover that Gator was in liquidation until after the problems with the concrete arose. In addition, the evidence shows that Scottsdale believed that there was an oral contract as evidenced by Scottsdale's letter to Gator after the Plaintiff made a claim. The letter stated that Scottsdale's' investigation indicated that Gator had an oral contract with the Plaintiff. Gator continued to carry commercial general liability insurance into August of 1994 and St. Pierre applied for the same insurance from Scottsdale in May of 1994.
No witness contradicted Vicari's testimony, although Theresa or Eddie St. Pierre could have been called to rebut the evidence. In Dennis v. Allstate Ins. Co., 94-305, p. 5 (La.App. 5th Cir.10/25/94), 645 So.2d 763, 765, we stated:
When a defendant in a civil case can by his own testimony throw light upon matters at issue which are necessary to his defense and peculiarly within his own knowledge, and he fails to go upon the witness stand, the presumption is raised, and will be given effect, that the facts as he would have then do not exist.
In Taylor v. Entergy Corp., 01-0805, p. 15 (La.App. 4th Cir.4/17/02), 816 So.2d 933, 944, the court noted:
The "uncalled witness" rule has been defined as an adverse presumption that arises when "a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence" and fails to call such witnesses.... A party's failure to call such witnesses gives rise to the presumption that "the witnesses' testimony would be unfavorable to him." ... Although the advent of modern, liberal discovery rules has been recognized to limit this rule, it "remains viable." ... "[t]he court may consider this presumption as it would any other relevant evidence in the case." Id. [Citations omitted]
Since Theresa and Eddie St. Pierre owned Gator, Defendants had the burden to call them as witnesses if they could have contradicted Vicari. Their failure to do so raises the presumption that their testimony would have been adverse to Gator's case. Dennis, 94-305, at p. 5, 645 So.2d at 765. Based on the evidence, the trial judge concluded that the Plaintiff proved the oral contract. We find no manifest error in that ruling.
Gator also argues alternatively that the Plaintiff abandoned the oral contract. We find that the Plaintiff did not abandon its contract with Gator. Vicari continued to talk to Gator's owners about the concrete at least until he learned of the liquidation. Furthermore, although Kirk St. Pierre testified, his testimony was vague and evasive regarding the intentions of Gator and St. Pierre toward each other, although he stated that Theresa St. Pierre would not help her "number two son" and they had not been on good terms during that time period. Nevertheless, Theresa St. Pierre instructed Vicari to put St. Pierre's name on the purchase order. Whatever their relationship, it is irrelevant since the evidence as a whole reasonably supports the trial judge's conclusion that Gator was obligated to provide concrete that met the design specifications. We *303 find no manifest error in that regard.[3]
Accordingly, the judgment of the trial court is hereby affirmed. Costs of this appeal are to be paid by the Defendants.

AFFIRMED.
DALEY, J., dissents with reasons.
DALEY, J., dissents with reasons:
The majority opinion affirms the trial court findings that there was an oral agreement between Peter Vicari General Contractor, Inc. (Vicari) and Gator Ready Mix, Inc. I respectfully dissent. All of the written documentation exchanged between the parties demonstrates that a written contract to supply concrete existed between Vicari and St. Pierre Ready Mix, Inc. If an oral contract existed between Vicari and Gator, that contract was clearly superceded by the written agreement between Vicari and St. Pierre Ready Mix, Inc.
The initial bid form, which was a document prepared by Vicari's estimator, identifies, in writing, St. Pierre Ready Mix, Inc. as the supplier of ready mix. While Gator was originally identified on the document as the supplier, Vicari testified that Gator was crossed out and replaced with St. Pierre Ready Mix. Mr. Vicari testified he had no objection to this modification. Thereafter, the written purchase agreement, prepared by Vicari, identified St. Pierre Ready Mix, Inc. as the supplier of ready mix. The purchase agreement is the only document that sets forth the terms and conditions of the sale and the specifications of the ready mix that was to be provided. The purchase agreement is signed by a representative of Vicari and St. Pierre Ready Mix. All invoices and shipping documents were prepared by St. Pierre Ready Mix. All testing and inspection reports identify St. Pierre Ready Mix as the concrete supplier. All payments for the ready mix supplied were made directly to St. Pierre Ready Mix, Inc. All correspondence concerning alleged defects in the ready mix supplied, prepared by Vicari, were addressed to St. Pierre Ready Mix, Inc. None were copied to or addressed to Gator Ready Mix, Inc. Peter Vicari states in a correspondence addressed to St. Pierre Ready Mix, Inc. dated May 19, 1994, "Based on the facts, it is my determination that your firm is the sole party responsible for the failure of the concrete to meet this specification." If, as argued by Vicari, St. Pierre Ready Mix, Inc. was a subcontractor for Gator Ready Mix, Inc. then the purchase agreement, invoicing, payments, and correspondence regarding disputes over quality would identify Gator Ready Mix at some stage. All of the written documentary evidence concerning this commercial transaction are between Vicari and St. Pierre Ready Mix, Inc. No written documentation evidences a contract between Vicari and Gator Ready Mix, Inc.
In the middle of this construction contract, when the problem over the quality of the ready mix presented itself, Vicari and St. Pierre Ready Mix, Inc. renegotiated the terms of the purchase agreement. Gator Ready Mix, Inc. does not participate in this renegotiation in any way.
Counsel for Vicari suggest that if the purchase agreement created a written contract between St. Pierre Ready Mix, Inc. and Vicari, there was also an oral contract between Gator Ready Mix and Vicari to supply the same ready mix under the same terms and conditions. To accept this *304 agreement I would have to ignore all of the written documentation between the parties. Because of the overwhelming documentary evidence in this case, I am forced to conclude that the trial court erred in finding that there was a binding oral agreement between Vicari General Contractor, Inc. and Gator Ready Mix, Inc. For the foregoing reasons, I would reverse the trial court's finding and vacate the judgment against Gator Ready Mix and Scottsdale Insurance Company.
NOTES
[1] The trial judge did not rule on the exception of lack of subject matter jurisdiction, but since we can notice this on our own motion, a remand is unnecessary. See: Lowenburg v. Entergy New Orleans, Inc., 99-2894 (La.12/17/99), 751 So.2d 868.
[2] Vicari also went to the plant to see the problem. He noticed that the facilities were antiquated, that it had low water pressure, that water had to be trucked in and that the gate through which the concrete mix was poured into the trucks was jamming or "choking," creating a problem with the mixture getting into the truck. He learned later from Gator that the gate tube was changed, but the problem continued and that it was ultimately determined that the gate was contributing to the problem. Once these problems were resolved, the concrete batches met the design requirements. Vicari testified further that Eddie St. Pierre was "fired" or "run off" because he disclosed these findings.
[3] The Defendant did not contest the finding of liability on the merits or the award. In addition, the Defendants did not brief the issue of the directed verdict. Thus, we consider that assignment of error abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.